T.C. Memo. 1996-84


UNITED STATES TAX COURT


PETER AND URSULA REIMANN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 9915-86, 35003-86,    Filed February 27, 1996.
          3398-92, 13892-92.


     <u>Elliot I. Miller</u>, for petitioners in docket Nos. 9915-86 and

35003-86.

     <u>Bernard S. Mark</u> and <u>Richard S. Kestenbaum</u>, for petitioners

in docket Nos. 3398-92 and 13892-92.

_____

[1]     Cases of the following petitioners are consolidated herewith
for opinion:  Edward Brodie and Estate of Alana Brodie, Deceased,
Edward Brodie, Executor, docket No. 35003-86; Marvin and Suzanne
Yarnell, docket No. 3398-92; and Philip and Roberta Yarnell,
docket No. 13892-92.  The cases were tried and briefed
separately.

Maureen T. O'Brien, Paul T. Colleran, and David N. Brodsky, for respondent in docket No. 9915-86.

Maureen T. O'Brien, Paul T. Colleran, Mae J. Lew, Louise Forbes, and David N. Brodsky, for respondent in docket No. 35003-86.

Lawrence L. Davidow and Frances Ferrito Regan, for respondent in docket Nos. 3398-92 and 13892-92.


MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These consolidated cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.[2]  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  These cases are part of the Plastics Recycling group of cases.  For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The issues in these cases involve the leasing of Sentinel expanded polyethylene

---

[2]    All section references are to the Internal Revenue Code, in effect for the year in issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

(EPE) recyclers by partnerships in which petitioners held limited partnership interests. The facts of the underlying transactions in these cases are substantially identical to those in the Provizer case.

In notices of deficiency, respondent determined the following deficiencies in and additions to petitioners' Federal income taxes for taxable year 1981:

| Docket No. | Petitioner | Deficiency | Additions to Tax | | |
|---|---|---|---|---|---|
| | | | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 9915-86 | Peter and Ursula Reimann | $43,025.11 | --- | --- | $8,873.10 |
| 35003-86 | Edward Brodie and Estate of Alana Brodie | 22,711.72 | --- | --- | 7,944.52 |
| 3398-92 | Marvin and Suzanne Yarnell | 165,899.00 | $7,716 | [1] | 49,770.00 |
| 13892-92 | Philip and Roberta Yarnell | 133,225.00 | 6,051 | [1] | 36,303.00 |

[1] 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.

Respondent also determined in each case that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c).[3] In docket Nos. 9915-86 and 35003-86, in amendments to the answers, respondent asserted additions to tax for 1981 under section 6653(a)(1) in the respective amounts of $2,151 and

---

[3] The notices of deficiency in docket Nos. 9915-86 and 35003-86 refer to sec. 6621(d). Sec. 6621(c) was repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400. The repeal does not affect the instant cases. For simplicity, we will refer to this section as sec. 6621(c). The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

$1,202, and under section 6653(a)(2) in amounts equal to 50 percent of the interest due on the respective underpayments attributable to negligence.

In docket No. 35003-86, respondent also determined deficiencies for taxable years 1979 and 1980. Those deficiencies and a portion of the deficiency determined for taxable year 1981 arose from adjustments relating to the Brodies' investment in Egar Investment Partners, with respect to the Arbitrage Tax Shelter Management Project. On October 2, 1992, respondent and the Brodies filed a Stipulation of Settlement of Tax Shelter Adjustment pertaining to all of the adjustments relating to Egar Investment Partners. The remaining adjustments in respondent's notice of deficiency not so settled, and at issue herein, pertain exclusively to Plymouth Equipment Associates.

Stipulations of Settled Issues concerning petitioners' respective investments in the Partnerships, and filed in each of these consolidated cases, provide in part:

> 1. Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns[4] as a result of their participation in the Plastics Recycling Program.
>
> 2. The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased

---

4       The Stipulation of Settled Issues in docket No. 9915-86 refers to "tax return" in the singular, instead of the plural "tax returns".

rate of interest established under I.R.C. §6621(c), formerly section 6621(d).

3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of I.R.C. Section 6653(a). [See supra note 3.]

Accordingly, the only issues remaining for resolution in these consolidated cases are: (1) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence; and (2) whether petitioners are liable for additions to tax under section 6659 for underpayments of tax attributable to valuation overstatements.

FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference. For convenience, facts unique to each of the individual cases under consideration are set forth separately at the end of the findings of fact.

Petitioners Reimann are limited partners in Scarborough Leasing Associates (Scarborough) and petitioners Brodie and the Yarnells are limited partners in Plymouth Equipment Associates (Plymouth). For convenience we refer to these two partnerships collectively as the Partnerships.

Petitioners have stipulated that the transactions involving the Sentinel EPE Recyclers leased by the Partnerships are

substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177.  In addition, petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the <u>Provizer</u> case.

In the <u>Provizer</u> case, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each.  ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each.  F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them to PI.  The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes.  Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes.  These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes would only be due after the nonrecourse portion, 90 percent, had been paid in full.

All of the monthly payments required among the entities in the above transactions offset each other.  These transactions were done simultaneously.  Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap.  The sublicense

agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, each of the Partnerships herein was formed to lease Sentinel EPE recyclers from F & G Corp. and license those recyclers to FMEC Corp. The transactions of the Partnerships differ from the underlying transactions in the Provizer case only as to (1) the number of machines sold, leased, licensed, and sublicensed, and (2) the entity that leased the machines from F & G Corp. and licensed them to FMEC Corp. In 1981 Plymouth and Scarborough each leased and licensed seven Sentinel EPE recyclers. For convenience we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions. In addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene recyclers. We refer to these collectively as the Plastics Recycling transactions.

With respect to each of the Partnerships, a private placement memorandum was distributed to potential limited partners. Appended to the offering memoranda were reports by F & G's evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor. The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships.

Specifically, the offering memoranda state: (1) That there is a substantial likelihood of audit by the Internal Revenue Service (IRS) and that the purchase price paid by F & G Corp. to ECI Corp. probably would be challenged as being in excess of fair market value; (2) that the Partnerships have no prior operating history; (3) that the general partners have no prior experience in marketing recycling or similar equipment; (4) that the limited partners have no control over the conduct of the Partnerships' business; (5) that there is no established market for the Sentinel EPE recyclers; (6) that there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) that certain potential conflicts of interest exist.

Petitioners in the cases under consideration do not have any education or work experience in plastics recycling or plastic materials. They did not independently investigate the Sentinel EPE recyclers or see a Sentinel EPE recycler or any other type of plastics recycler prior to participating in the recycling ventures.

Petitioners each learned of their respective Partnership transaction from members of the accounting firm Bachmann, Schwartz, and Abramson (Bachmann, Schwartz). Bachmann, Schwartz was formed in 1972 by Donald Bachmann (Bachmann) (deceased prior to trial), a certified public accountant (C.P.A.), William Abramson (Abramson), also a C.P.A., Richard Schwartz and Ivan

Babbitt.  Abramson and Bachmann previously had worked together at

Clarence Rainess & Co., Certified Public Accountants.  Joseph

Greene (Greene) was a partner at Bachmann, Schwartz for a time

during the early 1980's.  Bachmann, Schwartz specialized in

accounting for the garment industry.  The firm performed auditing

services, reviewed investment opportunities, and advised clients

in business and estate planning, as well as mergers and

acquisitions.  For time spent researching investment

opportunities, such as Plymouth and Scarborough, Bachmann,

Schwartz generally received a 5-percent commission on sales of

investments.  In these cases, Bachmann, Schwartz received a 10-

percent commission for placing the Partnership shares with

petitioners.[5]

Abramson generally was responsible for advising clients on

tax matters and for reviewing all tax returns before they were

---

[5]     The Plymouth and Scarborough offering memoranda both state
that the partnerships will pay sales commissions and fees to
offeree representatives in amounts equal to 10 percent of the
price paid by the investors represented by such persons.  The
offering memoranda further state that if such fees are not paid
"they will either be retained by the general partner as
additional compensation if permitted by applicable state law, or
applied in reduction of the subscription price."  The K-1's for
petitioners indicate that they paid full price for their
respective investments in the Partnerships.  Nothing in the
records in these cases indicates that any portion of the
commission or fee was rebated to the petitioners, and there is no
reason to believe that Bachmann, Schwartz, a firm of experienced
accountants which was active in the marketing of tax shelter
investments, failed to claim any portion of the commission
available to them.  Abramson testified that the firm generally
charged clients a 5-percent commission; Greene testified that the
commission could have been 10 percent.  The record as a whole
establishes that the commission to Bachmann, Schwartz was 10
percent.

submitted, while Bachmann advised clients on financial matters. Bachmann was a graduate of City College of New York. In addition to his work at Bachmann, Schwartz, he served as chairman of the board of a public company, Applied DNA, and for a time during the 1980's he chaired two New York State agencies, the Housing Finance Agency and the Hospital Agency. Abramson earned an undergraduate degree in accounting, a law degree, and a masters of law degree in taxation. Greene, also a C.P.A., received a B.A. degree from New York University and a Masters of Business Administration degree from Hofstra University in 1960.

Bachmann learned about the Sentinel EPE recyclers and the Plastics Recycling transactions from an acquaintance, Elliot Miller (Miller), and Abramson learned about them from Bachmann. Miller was corporate counsel to PI and a shareholder of F & G in 1981. Greene learned about the Plastics Recycling transactions from Bachmann and Abramson at a firm meeting. Bachmann and Abramson read the offering memoranda for the Partnership transactions. Bachmann reviewed the business aspects and Abramson reviewed the tax aspects. The two also traveled to Hyannis and toured PI's plant and offices and spoke to the principals of PI. Abramson had the understanding from statements made to him during the tour and from his reading of the offering circular that the recyclers somehow were unique. He also discussed tax matters with John Taggart, the head of the tax department of Windels, Marx, Davies & Ives (WMDI). WMDI prepared the tax opinion letter appended to the offering memoranda.

Neither Bachmann or Abramson had any expertise in plastics materials or plastics recycling. Abramson did not subscribe to any professional journals in the field of plastics. While at the PI plant in Hyannis, Abramson did not ask how much it cost to manufacture a recycler, or whether, or for how much, the recyclers were insured. Aside from his one visit to PI, Abramson has never before or since visited a plant which manufactures plastics recycling machinery. Abramson did not consult with an independent expert in the field of plastics recycling.

1. Peter and Ursula Reimann, Docket No. 9915-86

Petitioners Peter and Ursula Reimann resided in New York, New York, at the time their petition was filed. During 1981, Peter Reimann (Reimann) was an executive salesman at R.B.S. Fabrics, Ltd. (R.B.S.). His spouse, Ursula, was not employed outside the home. On their 1981 Federal income tax return, the Reimanns reported gross income from wages in the amount of $147,500 and total taxable income of $119,980. Consequently, in the absence of significant deductions or credits, in addition to the partnership losses claimed in the computation of total income, they were subject to payment of Federal income taxes in substantial amounts.

In 1981, Reimann acquired a 2.538-percent interest in Scarborough for his investment of $25,000. As a result of the passthrough from Scarborough, on their 1981 Federal income tax return, the Reimanns deducted an operating loss in the amount of $19,833. They claimed $33,428 of a total of $41,312 of

investment tax and business energy credits available to them from Scarborough.  Respondent disallowed the Reimanns' claimed operating loss and credits related to their investment in Scarborough.

Reimann received a textile education at the Zurich Textile School in Zurich, Switzerland, from which he graduated in 1959. Thereafter he apprenticed in various textile mills in Europe. Upon finishing his apprenticeships, Reimann returned to the United States and began working at his father's company, Bernard Reimann, a supplier of silk fabrics for the tie or neckwear trade.  Bernard Reimann subsequently merged with another fabric company and became R.B.S., which supplied fabrics to neckwear manufacturers.  Reimann worked first as a stylist and eventually as an executive salesman at R.B.S.  Reimann had no education, training, or experience in plastics recycling or plastics machinery.

Reimann learned of Scarborough and the Sentinel EPE recyclers from Bachmann.  Bachmann, Schwartz provided accounting and financial services to R.B.S.  Bachmann typically advised R.B.S. on financial matters, investments, and major business decisions.  Bachmann and Abramson held a meeting at their offices to explain the Scarborough partnership transaction and the Sentinel EPE recyclers.  They described their visit to PI's plant in Hyannis.  While Bachmann never quantified the potential economic profit of the venture, he spoke encouragingly about the

investment.  Reimann purportedly relied on Bachmann because his father's company relied on and trusted Bachmann.

Although Reimann read the Scarborough offering memorandum and the appended evaluations, he did not focus on or pay heed to the risks and caveats raised therein.  Reimann noticed the warning that there might be an IRS audit, but claims that he did not notice the warning that the IRS might challenge the value of the recyclers.  Reimann did not conduct an independent valuation of the recyclers, nor did he determine if the recyclers had been placed with end-users prior to his making the investment.  He did nothing more than ask Bachmann some questions about the offering memorandum.  Reimann claims he did not know whether Bachmann, Schwartz was being compensated in any manner with respect to the Scarborough partnership investment, nor did he ask if they were receiving compensation of any sort.

2.  <u>Edward Brodie and Estate of Alana Brodie, Docket No. 35003-86</u>

Petitioners Edward Brodie and his wife, Alana, resided in Englewood Cliffs, New Jersey, at the time their petition was filed.  During 1981, Edward Brodie (Brodie) was a salesman at his family's business, M & M Luggage Co., Inc. (M & M Luggage).  Alana Brodie was not employed outside the home.  On their 1981 Federal income tax return, the Brodies reported total income from wages, interest, dividends, capital gains, and other sources in the amount of $123,308.  Consequently, in the absence of significant deductions or credits, they were subject to payment of Federal income taxes in substantial amounts.

In 1981, Brodie acquired a 1.361-percent interest in Plymouth for his investment of $12,500. As a result of the passthrough from Plymouth, on their 1981 Federal income tax return, the Brodies deducted an operating loss in the amount of $10,158 and claimed investment tax and business energy credits totaling $20,673. Respondent disallowed the Brodies' claimed operating loss and credits related to their investment in Plymouth.

Brodie earned a degree in business from New York University in 1961. After graduation he worked at his family's luggage manufacturing business, M & M Luggage. Brodie initially was employed in various activities such as shipping, inventory, and loading and unloading trucks. Over time, he was promoted to and worked in the sales, production, and manufacturing departments.

Brodie learned of the Sentinel EPE recycler and Plymouth from Greene, who was at the time a partner at Bachmann, Schwartz. Greene provided accounting, business, and financial services to both M & M Luggage and Brodie individually. Brodie discussed with Greene the Plymouth investment, including the attendant tax benefits, the price of the recyclers, and the visit to PI by Bachmann and Abramson. At trial, Brodie recalled that Greene had told him that he thought the machines were fairly priced and that the investment would turn a profit. Brodie knew Greene had no expertise in plastics and was not an engineer; he relied on him for tax and investment advice. At trial, Brodie did not recall

compensating Greene in any manner for his advice regarding Plymouth.

Greene learned of the Sentinel EPE recyclers and Plymouth from Bachmann and Abramson at a firm meeting. Greene recalls that Bachmann was enthusiastic about the investment. At the firm meeting, Bachmann described the recycler and his and Abramson's visit to PI's plant in Hyannis. Greene did not discuss valuation with Bachmann. While Greene knew that Bachmann did not have any experience in plastics engineering or plastics technology, he nonetheless relied on whatever investigation Bachmann had made with respect to the Sentinel EPE recyclers and the Plastics Recycling transactions. Greene received his partnership share of the 10-percent commission Bachmann, Schwartz received for arranging the Brodies' investment in Plymouth.

Greene did not read the entire Plymouth offering memorandum and only glanced through the section entitled "Potential Conflicts of Interest." He could not recall at trial that Burstein, one of F & G's evaluators of the Sentinel EPE recycler, was a business associate and client of Miller, who was corporate counsel to PI and a shareholder of F & G in 1981. Greene did not check the figures or underlying assumptions in the offering memorandum, or prepare any sort of analysis for Brodie. Even though Bachmann, Schwartz had clients in the plastics business, Greene did not consult them about plastics recycling.

Brodie read the Plymouth offering memorandum, including the reports by F & G's evaluators. He understood that the tax

benefits exceeded the amount he invested, and that they were generated by the purported value of the Sentinel EPE recyclers. He read the warnings in the offering memorandum that the IRS would likely audit Plymouth and challenge the value of the machines. Brodie did nothing to verify the purported value of the Sentinel EPE recycler and undertook no research into Plymouth or plastics recycling aside from reviewing the offering memorandum and speaking with Greene. Although Brodie spoke to Greene about the investment every few months, he never knew for sure whether the recyclers were ever delivered to end-users. In fact, the recyclers were eventually placed with end-users which did not have sufficient amounts of recyclable plastic scrap material ever to pay off the notes on the recyclers. Brodie never made an economic profit in any year from Plymouth. After he received the tax credits in 1981, however, Brodie was not concerned that he received no dividends or return of capital with respect to the Plymouth investment.

3. <u>Marvin and Suzanne Yarnell, Docket No. 3398-92, and Philip and Roberta Yarnell, Docket No. 13892-92</u>

Petitioners Marvin and Suzanne Yarnell resided in Old Westbury, New York, when their petition was filed. Petitioners Philip and Roberta Yarnell resided in Manhasset, New York, when their petition was filed.

During 1981, Marvin Yarnell was a 75-percent owner and primary operating executive of Yarnell Fabrics Corporation (Yarnell Fabrics) and Yarnell Fabrics International, Ltd. (YFIL).

His wife, Suzanne Yarnell, was not employed outside the home. On their 1981 Federal income tax return, Marvin and Suzanne Yarnell reported gross income from wages of $350,000 and total income in the amount of $374,178. Consequently, in the absence of significant deductions or credits, they were subject to payment of Federal income taxes in substantial amounts.

Philip Yarnell was a salesman and 25-percent owner of Yarnell Fabrics and YFIL during 1981. His spouse, Roberta, was employed as a travel consultant during that year. On their 1981 Federal income tax return, Philip and Roberta Yarnell reported gross income from wages of $300,000 and total taxable income in the amount of $296,787. Consequently, in the absence of additional deductions or credits, they were subject to payment of Federal income taxes in substantial amounts.

For an investment of $75,000, Marvin Yarnell acquired a 7.62-percent interest in Plymouth in 1981. As a result of the passthrough from Plymouth, on their 1981 Federal income tax return, Marvin and Suzanne Yarnell deducted an operating loss in the amount of $60,952 and claimed investment tax and business energy credits totaling $124,034. Respondent disallowed Marvin and Suzanne Yarnell's claimed operating loss and credits related to their investment in Plymouth.

Also during 1981, Philip Yarnell acquired a 6.35-percent interest in Plymouth for an investment of $62,500. As a result of the passthrough from Plymouth, on their 1981 Federal income tax return, Philip and Roberta Yarnell deducted an operating loss

in the amount of $50,794 and claimed investment tax and business energy credits totaling $103,362. Respondent disallowed Philip and Roberta Yarnell's claimed operating loss and credits related to their investment in Plymouth.

Marvin Yarnell received a B.S. degree from New York University School of Commerce in 1949. After college, he worked for 3 years as a sales trainee for a textile company. Then he became a salesman for Cameo Fabrics and worked for that company for approximately 11 years. Philip Yarnell graduated from North Carolina State College with a degree in textile management and manufacturing. After college he worked for 4 years for a textile converter company, then started and ran his own business for approximately 12 years. In 1963, Philip and Marvin Yarnell formed Yarnell Fabrics, a textile converter corporation.

Both Marvin and Philip Yarnell learned of the Sentinel EPE recyclers and Plymouth from Bachmann and Abramson.[6] Bachmann, Schwartz had been the accounting firm for Yarnell Fabrics since the late 1970's. Marvin and Philip Yarnell primarily dealt with Bachmann, who also advised them on personal financial matters. Bachmann and Abramson described their trip to PI's plant in Hyannis and gave the Yarnells copies of the Plymouth offering memorandum. According to Marvin Yarnell, Bachmann pointed out

---

[6] At the trial, Abramson could not recall a specific meeting with the Yarnells for purposes of discussing the Plastics Recycling deal. Marvin Yarnell remembered a meeting at Bachmann's office whereas Philip Yarnell recalled that the proposal was introduced when Bachmann and Abramson came to Yarnell Fabrics.

that one of the components of polyethylene was oil and that recycling was good for the environment. Philip Yarnell claims he understood that there was no competition for the Sentinel EPE recycler. In fact, information published prior to the Plastics Recycling transactions indicated that several similar machines already were on the market. These included at least four other plastics recycling machines available during 1981, ranging in price from $20,000 to $200,000: Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulators. See Provizer v. Commissioner, T.C. Memo. 1992-177.

Philip Yarnell purportedly did not know whether Bachmann had any expertise in engineering or plastics. Marvin Yarnell, on the other hand, knew that Bachmann did not have any such expertise. Neither Marvin nor Philip Yarnell asked Bachmann to consult anyone with expertise in the field of plastics or plastics recycling. Both were aware that the amount of the tax benefits flowing from Plymouth exceeded their respective investments in the partnership. Marvin and Philip Yarnell did not independently investigate Plymouth or any of the representations made in the offering memorandum. The Yarnells did not have any education or work experience in plastics recycling or plastics materials.

## OPINION

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not

in excess of $50,000; (2) held that the transaction, which is almost identical to the Partnership transactions in these consolidated cases, was a sham because it lacked economic substance and a business purpose; (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers; and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that the investments in the Sentinel EPE recyclers in these cases are similar to the investment described in Provizer v. Commissioner, supra. The underlying transactions in these consolidated cases, and the Sentinel EPE recyclers considered in these cases, are the same type of transaction and same type of machine considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and petitioners' testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation

of the Sentinel EPE recyclers.  Respondent is sustained on the question of the underlying deficiencies.  We note that petitioners have explicitly conceded this issue in their respective stipulations of settled issues filed shortly before trial.  The record plainly supports respondent's determinations in these cases regardless of such concessions.  For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

Issue 1.  Section 6653(a) Negligence

In notices of deficiency, respondent determined that petitioners Marvin and Suzanne Yarnell and Philip and Roberta Yarnell were liable for additions to tax for negligence under section 6653(a)(1) and (2).  The Yarnells have the burden of proving that respondent's determinations of these additions to tax are erroneous.  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

In amendments to answer, respondent asserted that petitioners Reimann and Brodie were liable for additions to tax for negligence under section 6653(a)(1) and (2).  Because respondent raised these additions to tax for the first time in amendments to answer, respondent has the burden of proof on these issues.  Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or

regulations. In cases involving negligence, an additional amount is added to the tax under section 6653(a)(2); such amount is equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).

Petitioners in these consolidated cases contend that they were reasonable in claiming deductions and credits with respect to the Partnerships. To support their contentions, they allege, in general terms, that they relied upon the advice of qualified advisers, and that they expected an economic profit in light of the so-called oil crisis in the United States during 1981. In each of the cases before us, petitioners' investigation of the Partnership transactions and the Sentinel EPE recyclers was limited to conversations with Bachmann and Greene, respectively, and in varying degrees, a review of the offering memoranda.[7]

---

[7] It is unclear from the records to what extent Abramson influenced any of petitioners' decisions to invest in the Partnerships. While Abramson participated in the purported investigation of the Partnerships, petitioners' testimony indicates that their reliance was placed predominantly on Bachmann and Greene. Abramson's generally vague and indefinite testimony in these cases supports the conclusion that he was not

(continued...)

Petitioners essentially argue that their reliance on Bachmann, Schwartz and the offering materials insulates them from the negligence additions to tax.

Under some circumstances a taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974).

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v.

---

[7](...continued)
a primary adviser with respect to petitioners' investment in the Partnerships, although he was the primary tax specialist at Bachmann, Schwartz.

Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v.
Commissioner, 92 T.C. 958, 992-993 (1989), affd. without
published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v.
Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91
T.C. 524, 565 (1988). We have rejected pleas of reliance when
neither the taxpayer nor the advisers purportedly relied upon by
the taxpayer had substantial knowledge about the nontax business
aspects of the contemplated venture. Beck v. Commissioner, 85
T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983);
Steerman v. Commissioner, T.C. Memo. 1993-447.

Based upon our review of the entire records in these cases,
we hold that Brodie's purported reliance on Greene, and Reimann's
and the Yarnells' purported reliance on Bachmann, was not
reasonable, not in good faith, nor based upon full disclosure.
Neither Bachmann or Greene, nor petitioners, nor anyone
affiliated with Bachmann, Schwartz, had any education or work
experience in plastics materials or plastics recycling. None of
petitioners and no one at Bachmann, Schwartz consulted any
independent experts or conducted anything approaching a
meaningful investigation.[8] While Bachmann and Abramson did visit

---

[8] According to Abramson, Bachmann had a cousin who was an
engineer and taught at City College of New York. Abramson
testified that he thought Bachmann asked his cousin for the
cousin's opinion of the feasibility of the Sentinel EPE recycling
machinery and process. However, Abramson did not elaborate on
the cousin's response; he testified only that he was certain
Bachmann and he discussed the results of Bachmann's
investigation. We consider Abramson's testimony on this matter
of no probative value. We are not convinced that Bachmann spoke
(continued...)

PI's Hyannis plant, neither of them was qualified to analyze or assess the machines on display.  In each of these cases, petitioners' argument is that they put complete faith in Bachmann or Greene.  Given the technical nature of these investment ventures, it was unreasonable for them to do so.

Reimann did little more than speak with the accountants at Bachmann, Schwartz before investing in Scarborough.  He received a copy of the offering memorandum and attended an introductory meeting at the offices of Bachmann, Schwartz.  Reimann recalled that at the meeting, Bachmann explained the Scarborough transaction and described his and Abramson's visit to PI.  Reimann described his impressions as follows:

> I remember I was quite in awe of this huge office, huge
> conference room * * * [The facilities] * * * were
> extremely impressive, to say the least.  I had never
> been in that kind of situation before.  There's this
> huge conference table and a lot of people -- I presume
> most of them were partners and they were all basically
> giving me this wonderful advice.

The "wonderful advice" to which Reimann refers, of course, was the suggestion that he invest in the unsuccessful Plastics Recycling deal.  Reimann testified that he read the offering memorandum, but did not focus on the warnings or caveats contained therein.  At trial he could not recall the warning that the IRS might challenge the value of the recycler.  Reimann spent only enough time reading the offering memorandum "to get the gist

---

[8](...continued)
to a cousin about the recycler or that the cousin was qualified
to evaluate it.  Moreover, the record does not disclose the
cousin's opinion of the recycler.

of it".  He explained that as to review of the offering memorandum, he "really left it to Bachmann."

Reimann testified that his primary consideration for investing in Scarborough was profit, and that Bachmann never told him that the tax credits would exceed the amount of his investment.  He could not or would not recall or state at trial the amount of the credits he and his former wife claimed on their 1981 return or whether they paid any taxes that year, although this information was on the face of the return he had come from California to testify about.  On their tax return for 1981, the Reimanns claimed a tax refund in the amount of $21,570.  Reimann claims he never asked anyone at Bachmann, Schwartz whether the firm was receiving a commission on the Plastics Recycling investment.  He testified that he never made a determination that any of the recyclers would be placed with end-users prior to the time he made his investment but that he knew only that they were "planned to be placed."  According to Reimann, "These things I left to Bachmann, Schwartz and Abramson."

Marvin and Philip Yarnell likewise claim that they relied on the now-deceased Bachmann in deciding to invest in Plymouth.  Philip Yarnell says he did not know whether Bachmann had any expertise in engineering or plastics.  Marvin Yarnell knew Bachmann was not a specialist in plastics recycling, but he asserted confidence that Bachmann would have investigated the matter before recommending investment.  Philip Yarnell testified that his primary reason for making the investment "was the fact

that there would be a good return on the capital." Both Marvin and Philip Yarnell were aware that the tax benefits flowing from Plymouth exceeded the amount of their respective investments.

Philip Yarnell testified that he read the Plymouth offering memorandum and that, with the exception of the technical aspects, he understood the substance of what was set forth therein. However, in describing how Plymouth was supposed to generate an economic profit, he testified that he was informed that Plymouth would manufacture the recyclers, place them with end-users, and oversee their operation (all facets of the Plymouth transaction which were supposed to be performed by PI, not Plymouth).

Marvin Yarnell testified that he and Philip "briefly" read the offering memorandum and that, "quite frankly speaking, it was very lengthy. It was very detailed and such." He could not recall having read the reports of the evaluators and explained that he and his brother were very busy at the time working on their new company. In lieu of a thorough reading of the offering memorandum, or an independent investigation, the Yarnells met with Bachmann to get his opinion as to whether Plymouth was worth investing in. Marvin Yarnell testified that he and Philip invested in Plymouth based upon "what had been told to" them. He also testified that "if the details were mentioned to * * * [them], they really were not paid that much attention to because * * * [they] had * * * [their] own business to take care of."

Bachmann never represented that he had contacted an independent expert, and neither Marvin or Philip Yarnell ever

asked him to seek an expert opinion.  Marvin Yarnell did not investigate Plymouth and never asked Bachmann any questions about the underlying transaction.  Philip Yarnell did not investigate any of the representations set forth in the offering memorandum. The Yarnells' position is that they simply acted blindly on Bachmann's advice.  As Marvin Yarnell put it, Bachmann "was such an overwhelming personality, we almost felt it would be an affront if in any way at all we would not go along with his suggestions."  He reiterated:  "We really had blind faith in Don Bachmann."  Philip Yarnell testified that he "relied almost entirely and solely on * * * [Bachmann's] expertise.  * * * whatever he said, I, basically, took as gospel."

The Yarnells placed into the records of their cases several documents, ostensibly submitted as evidence that they monitored their investments in Plymouth.  These were unaudited financial statements of Plymouth for 1984 and 1985, a 1983 report describing PI's accounting procedures and controls, and a 1983 update from PI noting that "market prices for polyethelene resin have remained relatively low * * * [and] the Sentinel recyclers * * * have not been profitable."  Neither Marvin or Philip Yarnell testified that they examined these documents.  Given their admitted inattention to the details of the investment, we decline to infer from these documents that the Yarnells actively monitored their investments in Plymouth.

Brodie claims reliance on Greene, who in turn relied on Bachmann, with respect to Brodie's decision to acquire an

interest in Plymouth. Greene knew that Bachmann had no education or work experience in plastics or plastics recycling. Greene's review of the offering memorandum was fairly perfunctory. When asked at trial if he had read it, Greene replied, "I did read it, [but] I can't say that I read it cover-to-cover." Greene testified that although he did not discuss valuation with Bachmann, he did read and rely upon the reports by Ulanoff and Burstein. However, Greene only glanced at the section relating potential conflicts of interest, and he could not recall at trial that Burstein was a business associate and legal client of Miller's.

Greene did not check any of the underlying assumptions or figures set out in the offering memorandum. He did not prepare any kind of report or analysis for Brodie. He sought no independent verifications of the representations in the offering memorandum, even though Bachmann, Schwartz had clients who were in the plastics business. He relied exclusively on Bachmann. Greene reluctantly admitted that he received a commission as a result of Brodie's investment and that the amount of the commission paid could have been 10 percent.

Greene purportedly explained to Brodie the environmental and economic benefits of the Plastics Recycling transaction as well as the tax benefits. Brodie understood that the tax benefits exceeded the amount of his investment, and that they were generated by the purported value of the recyclers. However, he did nothing to verify the purported value of the Sentinel EPE

recycler.  Brodie undertook no research or investigation beyond speaking with Greene and "reviewing" the offering memorandum. Although Greene believed his commission was disclosed to Brodie by notice or letter, Brodie could not recall compensating Greene for, as he put it, the "service of submitting a prospectus for me to read and telling me that it was a good investment for me." Greene considered the Plastics Recycling deal a tax shelter with tax benefits for investors approximately four times the investment.  He obtained his information from Bachmann, and there is no reason to think he did not pass on this same information to his client, Brodie.

It was petitioners' reliance upon the purported value of the Sentinel EPE recycler that generated the deductions and credits in these cases.  Yet the purported value of the Sentinel EPE recyclers is the very thing that petitioners, and the accountants Bachmann, Schwartz, did not verify.  A taxpayer may rely upon his adviser's expertise (in these cases accounting, financial planning, and tax advice), but it is not reasonable or prudent for petitioners to rely upon an adviser regarding matters outside of his field of expertise or with respect to facts which he does not verify.  See Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329, affd. without published opinion 72 F.3d 123 (3d Cir. 1995).

Moreover, a careful consideration of the materials in the respective offering memoranda, especially the discussions in the

prospectuses of high writeoffs and risk of audit, should have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits. See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217. The preface to each memorandum contained the following: NO OFFEREE SHOULD CONSIDER THE CONTENTS OF THIS MEMORANDUM *** AS *** EXPERT ADVICE. EACH OFFEREE SHOULD CONSULT HIS OWN PROFESSIONAL ADVISERS AS TO LEGAL, TAX, ACCOUNTING AND OTHER MATTERS RELATING TO ANY PURCHASE BY HIM OF UNITS. Each of the memoranda also clearly stated that the respective Partnership transactions involved significant tax risks and that in all likelihood the IRS would challenge the transactions. In a "business risks" section, each warned that there was no history for the subject partnership and no established market for the recyclers or the pellets. It is clear from the records that none of petitioners carefully considered the offering memoranda.

On their face, the Partnership transactions should have raised serious questions in the minds of ordinarily prudent investors. According to the offering memoranda, the projected benefits for taxable year 1981 were, for each $50,000 investor: (1) Investment tax credits of $82,639 plus deductions of $39,323 (for investors in Scarborough) or $40,376 (for investors in Plymouth), all in the initial year of investment. In the first year of the investments alone, petitioners claimed the following

operating losses and investment tax and business energy credits related to the Partnerships:

| Petitioners | Investment | Operating Loss | IT + EC Credits |
|---|---|---|---|
| Reimann | $25,000 | $19,833 | $33,428 |
| Brodie | 12,500 | 10,158 | 20,673 |
| M. Yarnell | 75,000 | 60,952 | 124,034 |
| P. Yarnell | 62,500 | 50,794 | 103,362 |

Therefore, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, except for a few weeks at the beginning, none of petitioners ever had any money in the Partnerships.  A reasonably prudent person would not conclude without substantial investigation that the Government was providing significant tax benefits to taxpayers who made no investment of their own capital.  McCrary v. Commissioner, 92 T.C. 827, 850 (1989).

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.  Notwithstanding this concession, petitioners contend that they were reasonable in claiming credits on their Federal income tax returns based upon each recycler having a value of $1,162,666.  In support of this position, petitioners submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates.  Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners."  Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE

recycler was $250,000.  However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981 and 1982.

We accord no weight to the Carmagnola reports submitted by petitioners.  The projected valuations therein were based on inadequate information,[9] research, and investigation, and were subsequently rejected and discredited by their author. Respondent likewise rejected the reports and considered them unsatisfactory for any purpose, and there is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency.  Even so, petitioners' counsel obtained copies of these reports and urge that they support the reasonableness of the values reported on petitioners' returns.  Not surprisingly, petitioners did not call Carmagnola to testify in these cases,[10] but preferred instead to rely solely upon his preliminary, ill-founded valuation estimates.  The Carmagnola reports were a part of the record considered by this Court and reviewed by the Sixth Circuit Court

---

[9]     In one preliminary report, Carmagnola states that he has "a serious concern of actual profit-level" of a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

[10]     Carmagnola has not been called to testify in any of the Plastics Recycling cases before us.

of Appeals in the <u>Provizer</u> case, where we held the taxpayers negligent. Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence. Petitioners are not relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Petitioners' reliance on <u>Mollen v. United States</u>, 72 AFTR2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993) is misplaced. The taxpayer in <u>Mollen</u> was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical Association, led a continuing medical education ("CME") accreditation program for local hospitals. The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership which invested in the production, marketing, and distribution of medical educational video tapes. The taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable. Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer regarding those matters. Moreover, as the District Court noted, the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable."

The records in these cases, on the other hand, show that neither petitioners nor their advisers, Bachmann and Greene, had any formal education, expertise, or experience in plastics or plastics recycling. None of them had any personal insight or

industry know-how in plastics recycling which would reasonably lead them to believe that the Partnership transactions would be economically profitable. The extent of the Bachmann, Schwartz investigation was a tour of PI's plant in Hyannis and a discussion with the principals of PI. No independent experts in the field of plastics or plastics recycling were consulted by petitioners or Bachmann, Schwartz. The facts of these cases are distinctly different from those in the Mollen case. We consider petitioners' arguments with respect to the Mollen case inapplicable.

Petitioners' arguments are not supported by Anderson v. Commissioner, 62 F.3d 1266 (10th Cir. 1995), affg. T.C. Memo. 1993-607, where the taxpayers were found liable for negligence additions to tax. In Anderson, the taxpayers claimed tax benefits based upon their acquisition of property listed at $124,500, for which they actually paid $6,225 in a cash downpayment (5 percent of the purchase price) plus a 5-year financing arrangement. Had the acquisition been nothing more than a $6,225 passive investment, noted the Court of Appeals, it would have been reasonable for the taxpayers to rely on the advice of a good friend who had thoroughly investigated the investment.[11] However, because the transaction was structured

---

[11] The adviser had his accountant and attorney review and check out the structure of the investment; he spoke with the investment principal; he looked into the principal's background and checked out his references, banks, other business connections, and the Better Business Bureau; and he spoke with competitors to make

(continued...)

and represented as a purchase in the amount of $124,500, the Court of Appeals held that something more was required.

In the cases before us, petitioners claimed tax benefits based on the assumption that they owned and leased, through the Partnerships, an interest in $8,138,662 worth of recycling machines. Based on investments ranging from $12,500 to $75,000, petitioners each claimed a qualified investment in new investment credit property with bases ranging from $103,361 to $620,167. These inflated bases generated claims to first-year tax credits ranging from $20,673 to $124,034, and claims to deductible losses ranging from $10,158 to $60,952. Clearly these were substantial transactions requiring careful investigation under the Anderson case. Of petitioners' respective advisers, Bachmann did nothing more than tour PI's plant in Hyannis, speaking only with insiders, and Greene did nothing, relying exclusively on Bachmann. Unlike the adviser in Anderson, no one at Bachmann, Schwartz thoroughly investigated or educated himself in the industry of the proposed investment. In view of the substantial basis claimed for the interest of each petitioner in the machinery (a substantial amount, and in each case, more than eight times greater than the cash invested), from which the investment credits stemmed, plainly something more was required. Accordingly, we consider petitioners' reliance on the Anderson case inappropriate.

---

[11](...continued)
sure the venture was viable.

Petitioners also argue, in general terms, that they were reasonable in claiming the deductions and credits related to the Partnerships because of rising oil prices in the United States in 1981. In support of this argument, petitioners placed into the record several articles from Modern Plastics and an energy projections report from the U.S. Department of Energy (DOE), all published in the years 1980 and 1981. Petitioners also cite Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), and Rousseau v. United States, 91-1 USTC par. 50,252 (E.D. La. 1991).

The articles from Modern Plastics and the report by the DOE speculated on the price of oil, among other matters. The preface to the DOE report cautioned about "the tremendous uncertainties underlying energy projections" and warned "that [their] projections do not constitute any sort of blueprint for the future." Reflective of such uncertainties, an April 1980 article in Modern Plastics contemplated resin price hikes, while a May 1981 article predicted a leveling off of prices, market disruptions, and an industrywide shakeout. Petitioners do not purport to have read, or in any way relied upon, the DOE report or the Modern Plastics articles, and have not otherwise explained the connection between these speculative materials and their investments in the Partnerships. Petitioners' vague, general claims concerning the so-called oil crisis are without merit.

Petitioners' reliance on Krause v. Commissioner, supra, is misplaced. The facts in the Krause case are distinctly different

from the facts of these cases. In the <u>Krause</u> case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The <u>Krause</u> opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. <u>Id.</u> at 135-136. In holding that the taxpayers in the <u>Krause</u> case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology." <u>Id.</u> at 177. In the present cases, however, one of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil, that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products." While EOR was, according to our <u>Krause</u> opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners investing in recycling of polyethylene, particularly in the machinery here in question.

Moreover, the taxpayers in the <u>Krause</u> opinion were experienced in or investigated the oil industry and EOR

technology specifically.  One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology.  The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials.  Id. at 166.  In the present cases, none of petitioners has any education or work experience with respect to plastics or plastics recycling.  Petitioners did not independently investigate the Sentinel EPE recyclers, nor did they hire an expert in plastics to evaluate the Partnership transactions.  Petitioners' arguments with respect to the Krause case are inapplicable here.

Petitioners' reliance on Rousseau v. United States, supra, is similarly misplaced.  In Rousseau, the property underlying the investment, ethanol producing equipment, was widely considered at that time to be a viable fuel alternative to oil and its potential for profit was apparent.  In addition, the taxpayer therein conducted an independent investigation of the investment and researched the market for the sale of ethanol in the United States.  In contrast, as we noted in distinguishing the Krause case, there is no showing in these records that the so-called oil crisis would provide a reasonable basis for petitioners' investing in the polyethylene recyclers here in question.  See supra pp. 38-39.  Petitioners did not independently investigate the Sentinel EPE recyclers or hire an expert in plastics to evaluate the Partnership transactions.  The facts of petitioners'

cases are distinctly different from the <u>Rousseau</u> case. Accordingly, we do not find petitioners' arguments with respect to the <u>Rousseau</u> case applicable.

Under the circumstances of these cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their respective Federal income tax returns. Petitioners claim that they relied blindly upon their accountants, one of whom, Bachmann, they uniformly describe as a "financial genius". Bachmann is deceased, so we are unable to inquire whether he would claim full credit for what Reimann describes as "this wonderful advice" to invest in the Partnerships. Abramson, the primary tax partner at Bachmann, Schwartz, plainly made only a cursory investigation of the transaction and was not a central figure in these investments. Greene, a Bachmann, Schwartz partner who presented the deal to Brodie, described it as a 4 to 1 tax shelter on which the firm received a 10-percent commission. Petitioners described themselves as innocents who simply followed the advice of their accountants, whose instructions they would not even presume to question. But the record indicates that petitioners were educated, experienced, successful, and prosperous businessmen capable of making their own decisions. Certainly the accountants who testified indicated that interests in the Plastics Recycling partnership were offered only to clients with income available for high risk tax shelter deals which the firm made available and on which it received a commission. Petitioners invested what

Marvin Yarnell described as funds in excess of "case" money, that is, he explained, excess amounts they did not need for present or anticipated business purposes or living expenses. The records in these cases show that the accountants offered their clients an admittedly high risk transaction, involving an industry and machinery about which neither the accountants nor petitioners had any expertise or significant understanding. These petitioners, knowing the substantial tax benefits and little more about the transaction, and knowing that their advisers had no expertise in the area of the investment, took the risk. However, they did not in good faith directly or indirectly investigate the underlying viability, financial structure, and economics of the Partnership transactions. We hold, upon consideration of the entire records, that petitioners are liable for the negligence additions to tax under the provisions of section 6653(a)(1) and (2) for 1981. Respondent is sustained on this issue.

Issue 2. Section 6659 Valuation Overstatement

Respondent determined that petitioners were each liable for the section 6659 addition to tax on the portion of their respective underpayments attributable to valuation overstatement. Petitioners have the burden of proving that respondent's determinations of these section 6659 additions to tax are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is

attributable to" a valuation overstatement.  Sec. 6659(a), (d).
A valuation overstatement exists if the fair market value (or
adjusted basis) of property claimed on a return equals or exceeds
150 percent of the amount determined to be the correct amount.
Sec. 6659(c).  If the claimed valuation exceeds 250 percent of
the correct value, the addition is equal to 30 percent of the
underpayment.  Sec. 6659(b).

Petitioners each claimed an investment tax credit and a
business energy credit based on purported values of $1,162,666
for each Sentinel EPE recycler.  Each of petitioners concedes
that the fair market value of each recycler was not in excess of
$50,000.  Therefore, if disallowance of petitioners' claimed
credits is attributable to the valuation overstatements,
petitioners are liable for the section 6659 addition to tax at
the rate of 30 percent of the respective underpayments of tax
attributable to the credits claimed with respect to the
Partnerships.

Section 6659 does not apply to underpayments of tax that are
not "attributable to" valuation overstatements.  See McCrary v.
Commissioner, 92 T.C. 827 (1989); Todd v. Commissioner, 89 T.C.
912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).  To the extent
taxpayers claim tax benefits that are disallowed on grounds
separate and independent from alleged valuation overstatements,
the resulting underpayments of tax are not regarded as
attributable to valuation overstatements.  Krause v.
Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v.

Commissioner, supra), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

In the respective stipulations of settled issues, petitioners concede that they "are not entitled to any deductions, losses, investment credits, business energy investment credits, or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program." In Todd v. Commissioner, supra, and McCrary v. Commissioner, supra, we denied application of section 6659, even though the subject property was overvalued, because the related deductions and credits had been conceded or denied in their entirety on other grounds. In Todd, we found that an underpayment was not attributable to a valuation overstatement because property was not placed in service during the years in issue. In McCrary, we found the taxpayers were not liable for the section 6659 addition to tax when, prior to the trial of the case, the taxpayers conceded that they were not entitled to the

investment tax credit because the agreement in question was a license and not a lease. In both cases the underpayment was deemed attributable to something other than a valuation overstatement.

This Court has held that concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630. Instead, what is significant is the ground upon which the investment tax credit is disallowed or conceded. Chiechi v. Commissioner, supra. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. Gainer v. Commissioner, 893 F.2d 225, 228 (9th Cir. 1990), affg. T.C. Memo. 1988-416; Irom v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part and remanding T.C. Memo. 1988-211; Harness v. Commissioner, supra.

No argument was made and no evidence was presented to the Court in the present cases to prove that disallowance and concession of the investment tax credits related to anything other than a valuation overstatement. To the contrary, petitioners stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, T.C. Memo. 1992-177. In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to

tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers. The overvaluation of the recyclers, exceeding 2325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance. Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that the underlying transactions here were shams and lacked economic substance.

Consistent with our findings in Provizer, petitioners respectively stipulated that the Scarborough and Plymouth transactions had no net equity value, that the sole activity of the Scarborough and Plymouth partnerships lacked any potential for profit, and that the Scarborough and Plymouth partnership transactions therefore lacked economic substance. When a transaction lacks economic substance, section 6659 will apply because the correct basis is zero and any basis claimed in excess of that is a valuation overstatement. Gilman v. Commissioner, supra; Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

We held in Provizer v. Commissioner, supra, that each Sentinel EPE recycler had a fair market value not in excess of $50,000. Our finding in the Provizer case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable

from our finding of a lack of economic substance.  Petitioners conceded that the Scarborough and Plymouth transactions were similar to the Clearwater transaction described in Provizer v. Commissioner, supra, and that the Scarborough and Plymouth transactions lacked economic substance.  Given those concessions, and the fact that the records here plainly show that the overvaluation of the recyclers was the reason for the disallowance of the tax benefits, and the fact that no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the tax benefits related to anything other than a valuation overstatement, we conclude that the deficiencies caused by the disallowance of the claimed tax benefits were attributable to the overvaluation of the Sentinel EPE recyclers.

Finally, we consider petitioners' express arguments as to waiver of the addition to tax under section 6659.  On brief, petitioners each contested imposition of the section 6659 addition to tax on the grounds that respondent erroneously failed to waive the addition to tax.  Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatement if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith.  Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion.  Krause v. Commissioner, 99 T.C. at 179.

Petitioners urge that they relied on Bachmann and Greene, respectively, and in varying degrees the offering memoranda, in deciding on the valuation claimed on their tax returns. Petitioners each contend that such reliance was reasonable, and, therefore, respondent should have waived the section 6659 addition to tax. Petitioners cite Krause v. Commissioner, supra; Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23; Rousseau v. United States, 91-1 USTC par. 50,252 (E.D. La. 1991); in support of their argument.

We have found that petitioners' purported reliance on Bachmann and Greene, and the offering memoranda, was not reasonable. Neither Bachmann nor Greene, nor petitioners nor anyone affiliated with Bachmann, Schwartz, was educated or experienced in plastics or plastics recycling. The evaluators whose reports were appended to each of the offering memoranda each owned interests in partnerships which leased Sentinel EPE recyclers. The offering memoranda contained numerous caveats, including the following: NO OFFEREE SHOULD CONSIDER THE CONTENTS OF THIS MEMORANDUM *** AS *** EXPERT ADVICE. EACH OFFEREE SHOULD CONSULT HIS OWN PROFESSIONAL ADVISERS. Petitioners did not see a Sentinel EPE recycler prior to investing in Scarborough or Plymouth, nor did they independently investigate the recyclers.

Petitioners' reliance on Krause v. Commissioner, supra, Mauerman v. Commissioner, supra, and Rousseau v. United States, supra, in support of their contentions that they acted reasonably, is misplaced. In the Krause and Rousseau cases, the

section 6659 addition to tax was disallowed in light of the respective holdings that the taxpayers in each case had a reasonable basis for the valuations claimed on the tax returns or had reasonable cause for the understatements on the returns and were not subject to negligence additions to tax. In contrast, we have held that petitioners herein did not act reasonably in claiming deductions and investment tax credits related to the Partnerships, that the errors on petitioners' tax returns were caused by the excessive valuations of the underlying machinery in the Partnership transactions, that petitioners lacked reasonable cause for such overvaluation, and that each petitioner is therefore liable for the negligence additions to tax under section 6653(a). See supra pp. 20-40. Accordingly, petitioners' reliance on the Krause and Rousseau cases is misplaced.

In Mauerman, the Tenth Circuit Court of Appeals held that the Commissioner had abused her discretion for not waiving a section 6661 addition to tax. Like section 6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith. Sec. 6661(c). The taxpayer in Mauerman relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized. The advice relied upon by the taxpayer in Mauerman was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In these cases, particularly with respect to valuation,

petitioners relied upon advice which was outside the scope of expertise and experience of their advisers.  Consequently, we consider petitioners' reliance on the <u>Mauerman</u> case inapplicable.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations reflected on their tax returns with respect to their investments in Scarborough and Plymouth. In these cases respondent properly could find that petitioners' respective reliance on Bachmann and Greene, and in varying degrees the offering materials, was unreasonable.  The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position.  We hold that respondent's refusal to waive the section 6659 addition to tax is not an abuse of discretion.  Petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed tax benefits. Respondent is sustained on this issue.

<u>Decisions will be entered</u>

<u>under Rule 155</u>.