T.C. Memo. 1996-538


UNITED STATES TAX COURT


ALLAN J. AND BRENDA BECKER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 28975-89.                    Filed December 9, 1996.


<u>David M. Kohane</u>, <u>Jeffrey H. Schechter</u>, and <u>Ivan Taback</u>, for

petitioners.

<u>Barry J. Laterman</u>, for respondent.

CONTENTS

                                                        Page
MEMORANDUM FINDINGS OF FACT AND OPINION...................... 2
OPINION OF THE SPECIAL TRIAL JUDGE.......................... 2
FINDINGS OF FACT............................................ 5
  A. The Plastics Recycling Transactions.................... 5
  B. The Partnerships...................................... 9
  C. Stuart Becker........................................11
  D. Petitioner Allan J. Becker and His Introduction to
     the Partnership Transactions..........................14
OPINION....................................................18

    A. Statute of Limitations....................................21
    B. Section 6653(a)--Negligence..............................25
    C. Section 6659--Valuation Overstatement....................41

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  This case was assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.  All section references are to the Internal Revenue Code in effect for the tax years in issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  This case is part of the Plastics Recycling group of cases.  For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The facts of the underlying transactions involving the Sentinel recyclers in this case are substantially identical to the transaction considered in the Provizer case.

In a notice of deficiency dated September 6, 1989, respondent determined a deficiency in petitioner Allan J. Becker's 1982 Federal income tax in the amount of $9,901, and additions to tax for that year in the amount of $527.70 under

section 6659[1] for valuation overstatement, in the amount of $495.05 under section 6653(a)(1) for negligence, and under section 6653(a)(1)(B)[2] in an amount equal to 50 percent of the interest due on the amount of the underpayment attributable to negligence. Respondent also determined that interest on the deficiency accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). Both the increased rate of interest and the additional interest for negligence were calculated on the amount of $1,899.

In a second notice of deficiency dated September 6, 1989, respondent determined a deficiency in petitioners' 1979 joint Federal income tax in the amount of $262. The deficiency for taxable year 1979 was due entirely to the disallowance of an investment credit carryback from 1982.

In a notice of deficiency dated October 5, 1989, respondent determined a deficiency in petitioner Allan J. Becker's 1981 Federal income tax in the amount of $15,377, and an addition to tax for that year in the amount of $4,613 under section 6659 for valuation overstatement. Respondent also determined that interest on the deficiency accruing after December 31, 1984,

[1] In the alternative to the sec. 6659 addition to tax, respondent determined an addition to tax under sec. 6661 for substantial understatement of liability.

[2] For taxable year 1982, the addition to tax for negligence in an amount equal to 50 percent of the interest due on the amount of the underpayment attributable to negligence was provided for under sec. 6653(a)(2), not sec. 6653(a)(1)(B).

would be calculated at 120 percent of the statutory rate under section 6621(c).

In her answer, respondent asserted negligence additions to tax for 1979 and 1981, increased additions to tax under sections 6653(a)(2) and 6659 for 1982, and a decreased addition to tax under section 6659 for 1981, as follows:

| Year | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
|------|--------------|-----------------|-----------------|-----------|
| 1979 | $13.10 | -- | -- | -- |
| 1981 | -- | $768.85 | [1] | $3,714 |
| 1982 | -- | -- | [1] | 2,401 |

[1]    50 percent of the interest due on the amount of the underpayment attributable to negligence.  Respondent asserted that the amounts of the underpayments attributable to negligence for 1981 and 1982, respectively, were $15,377 and $9,901.

For taxable year 1982, respondent also asserted that the increased rate of interest under section 6621(c) applied to the entire deficiency for that year.  We consider the amounts in dispute to be adjusted accordingly.

The parties filed a Stipulation of Settled Issues concerning the adjustments relating to petitioner Allan J. Becker's participation in the Plastics Recycling Program.  The stipulation provides:

1.  Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their 1979, 1981 and 1982 returns as a result of their participation in the Plastics Recycling Program.

2.  The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c),

formerly §6621(d).

3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of §6653(a).

4. With respect to the issue of the addition to the tax under I.R.C. §6659, petitioners do not intend to contest the issue of the value of the Sentinel Recycler or the existence of a valuation overstatement on the petitioners' returns; however, petitioners reserve their right to contend that the Section 6659 penalty is not applicable in this case.

The issues remaining in this case are: (1) Whether the assessments in this case are time-barred; (2) whether petitioners are liable for the additions to tax for negligence under the provisions of section 6653(a); and (3) whether petitioners are liable for additions to tax under section 6659 for underpayments of tax attributable to valuation overstatements.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

A. The Plastics Recycling Transactions

This case concerns petitioner Allan J. Becker's investments in two limited partnerships: SAB Resource Recovery Associates (SAB Recovery) and SAB Resource Recycling Associates (SAB

Recycling).[3]  SAB Recovery and SAB Recycling purported to lease Sentinel expanded polyethylene (EPE) recyclers.  SAB Recovery also owned interests in two partnerships that purported to lease Sentinel EPE recyclers, Scarborough Leasing Associates (Scarborough) and Plymouth Equipment Associates (Plymouth).  For convenience, we refer to these four partnerships collectively as the Partnerships.

The transactions involving the Sentinel EPE recyclers purportedly leased by the Partnerships are substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, T.C. Memo. 1992-177.  Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each.  ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each.  F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI.  The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes.  Approximately 7 percent of the sales price of the recyclers sold by ECI Corp.

---

[3]  The record here does not include copies of the SAB Recovery and SAB Recycling offering memoranda.  For a more detailed discussion of SAB Recovery and SAB Recycling, see Gollin v. Commissioner, T.C. Memo. 1996-454.

to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

The six Sentinel EPE recyclers purportedly leased by Clearwater were used infrequently and often were not in use at all. PI failed promptly to pick up the scrap and at times, did not pay the end-user for the scrap that it did pick up. Also, PI sometimes failed promptly to reclaim the machines that were rejected by prospective end-users. One of the six recyclers bought by Clearwater, for example, was placed with four different end-users in 4 years. The first end-user refused to accept delivery of the recycler. The second end-user found the recycler to be too costly and noisy. PI took 6 months to pick up the

recycler after PI was notified by the second end-user that it no longer wanted the recycler. The third end-user ran a cost/benefit analysis on the recycler and found it unprofitable. PI waited another 6 months before picking up the recycler. The last end-user used the machine infrequently and was not paid for the recycled scrap produced.

Like Clearwater, each of the Partnerships leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp. The transactions of the Partnerships differ from the underlying transactions in the Provizer case in the following respects: (1) The entity that leased the machines from F & G Corp. and licensed them to FMEC Corp., and (2) the number of machines sold, leased, licensed, and sublicensed. Each of the Partnerships leased and licensed seven Sentinel EPE recyclers.[4]

For convenience, we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions. In addition to the Partnership transactions, a number of other limited

---

[4] The 1981 partnership returns for SAB Recovery, Scarborough, and Plymouth indicate that those partnerships leased and licensed seven Sentinel EPE recyclers. Although the record is without a partnership return or a copy of the offering memorandum for SAB Recycling, the amount of basis allocated to petitioner Allan J. Becker, based on his interest in SAB Recycling, is consistent with ownership of seven Sentinel EPE recyclers. SAB Recovery, Scarborough, and Plymouth each reported a basis in their seven recyclers in the amount of $8,138,667. Petitioner Allan J. Becker acquired a 0.507692-percent interest in SAB Recycling in 1982. On his 1982 return, he reported a basis in the recyclers in the amount of $41,320 ($8,138,667 x 0.00507692 = $41,319.36).

partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene (EPS) recyclers.  We refer to these collectively as the Plastics Recycling transactions.

B.  The Partnerships

SAB Recovery and SAB Recycling were organized and promoted by petitioner's brother Stuart Becker (Becker), a certified public accountant and the founder and principal owner of Stuart Becker & Co., P.C. (Becker Co.), an accounting firm that specialized in tax matters.  SAB Recovery was formed in late 1981 and SAB Recycling was formed in early 1982.  Becker organized a total of six recycling partnerships (the SAB Recycling Partnerships).  Two of the SAB Recycling Partnerships closed in late 1981, two closed in early 1982, and two more closed in late 1982.

The general partner of each of the SAB Recycling Partnerships, including SAB Recovery and SAB Recycling, is SAB Management Ltd. (SAB Management).  SAB Management is wholly owned by Scanbo Management Ltd. (Scanbo), which is wholly owned by Becker.  Scanbo is an acronym for the names of three of Becker's children:  Scott, Andy, and Bonnie.  SAB Management did not engage in any business before becoming involved with the SAB Recycling Partnerships.

With respect to each of the SAB Recycling Partnerships, a private placement memorandum was distributed to potential limited

partners.  Reports by F & G Corp.'s evaluators, Dr. Stanley M. Ulanoff (Ulanoff), who had a background in marketing, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor, were appended to the offering memoranda.  Ulanoff owns a 1.27-percent interest in Plymouth Equipment Associates and a 4.37-percent interest in Taylor Recycling Associates, partnerships that leased Sentinel recyclers.  Burstein owns a 2.605-percent interest in Empire Associates and a 5.82-percent interest in Jefferson Recycling Associates, also partnerships that leased Sentinel recyclers.  Burstein also was a client and business associate of Elliot I. Miller (Miller), the corporate counsel to PI.

SAB Management received fees of approximately $500,000 as the general partner of the SAB Recycling Partnerships.  In addition, Becker Co. prepared the partnership returns and Forms K-1 for all of the SAB Recycling Partnerships and received fees for those services.  Although the Plastics Recycling transactions generally provided for commissions to finders or brokers in the transactions, neither SAB Management nor Becker retained or received any sales commissions or offeree representative fees. Instead, after the closing of each SAB Recycling Partnership, Becker rebated to each investor the portion of such investor's original investment that would have otherwise been allocated to a sales commission or offeree representative fee.

At the time of the closings for the Sentinel EPE recyclers, there was no established market for leasing or operating the

Sentinel EPE recyclers. The Sentinel EPE recyclers were placed with end-users that did not have sufficient amounts of scrap ever to pay off the notes on the machines. The Partnerships had no net equity value and the only activity in which they were involved lacked any potential for profit.

## C. Stuart Becker

Becker does not have an engineering background, and he is not an expert in plastics materials or plastics recycling. He received a B.S. degree in accounting from New York University in 1964 and an M.B.A. in taxation from New York University School of Business Administration in 1973. He passed the certified public accountancy test in 1967 and was the winner of the gold medal, awarded for achieving the highest score on the examination for that year. Since early 1966, Becker has practiced as an accountant exclusively in the tax area. From 1964 until 1972 he worked for the accounting firm of Touche, Ross & Co., and in 1972 he joined the accounting firm of Richard A. Eisner & Co. as the partner in charge of the tax department. In 1977, Becker founded Becker Co.

Becker had considerable experience involving tax shelter transactions before he organized the SAB Recycling Partnerships. He prepared opinions regarding tax shelters' economic and tax projections, advised individuals and companies with respect to investments in tax shelters, lectured extensively about tax shelter investments generally, and lectured and published with

respect to leveraged tax shelters. Becker described a leveraged tax shelter as "a transaction where * * * [the ratio of] the effective * * * [tax] writeoff, which includes the value of the tax credit, * * * [to the amount invested] exceeds one to one." Becker Co. specialized in tax-advantaged investments. From 1980 to 1982, approximately 60 percent of the work done by Becker Co. involved tax sheltered and private investments. Becker has owned minority interests in general partners of numerous limited partnerships. Prior to organizing the SAB Recycling Partnerships, Becker owned 5 percent of the general partner of partnerships involved in approximately 14 transactions concerning river transportation (such as barges, tow boats, and grain elevators).

Although investment counseling was related to his firm's line of business, Becker did not consider himself in the business of providing investment advice. Becker did not normally hire other professionals for consultation or advice. In circumstances where he believed there was a need for outside advice, he would so advise the client. Between 30 and 40 of Becker's clients invested in the Plastics Recycling transactions.

Becker learned of the Plastics Recycling transactions when a prospective client presented him with an offering memorandum concerning the transactions in August or September 1981. Becker reviewed the offering memorandum and spoke to Miller, one of the key figures in the transactions and an acquaintance of Becker's.

Miller was a shareholder of F & G Corp. and, as noted, the corporate counsel to PI. He also represented Robert Grant (Grant), the president and 100 percent owner of the stock of ECI Corp., and some of Grant's clients. Thereafter, Becker recommended the investment to the prospective client. Although the prospective client did not invest in the Plastics Recycling transactions, Becker became interested in the proposal and organized the SAB Recycling Partnerships in order to make similar investments in Sentinel EPE recyclers conveniently available to appropriate clients.

In organizing the SAB Recycling Partnerships, Becker was not allowed to change the format of the transactions or the purchase, lease, or licensing prices of the Sentinel EPE recyclers. He was allowed only to conduct a limited investigation of the proposed investments and choose whether or not to organize similar partnerships. Becker relied heavily upon the offering materials and discussions with persons involved in the matter to evaluate the Plastics Recycling transactions. He and two other members of Becker Co., Leicht and Tucker, investigated PI and visited its plant in Hyannis, Massachusetts, where they saw the Sentinel EPE recyclers.

During his investigation of the Plastics Recycling transactions, Becker did not hire any plastics, engineering, or technical experts, or recommend that his clients do so. Becker discussed the transactions with Michael Canno (Canno) of the

Equitable Bag Co., a manufacturer of paper and plastic bags. Canno never saw the recyclers or the pellets and never wrote any reports assessing the equipment or the pellets. In addition, Becker retained a law firm, Rabin & Silverman, to assist him in organizing the SAB Recycling Partnerships. See Spears v. Commissioner, T.C. Memo. 1996-341, to the effect that in employing the law firm, Becker sought particularly to protect himself against liability.

After the 1981 SAB Recycling Partnerships closed, Becker had an accountant sent to PI to confirm, by serial number, that as of December 31, 1981, the equipment that was leased to the 1981 SAB Recycling Partnerships was indeed available for use. Becker arranged for this verification, independent of PI, because he understood that the investment tax and business energy credits would not be available if the qualifying property were not available for use.

D. Petitioner Allan J. Becker and His Introduction to the Partnership Transactions

At the time their petition was filed, petitioner Allan J. Becker resided in Mahwah, New Jersey, and petitioner Brenda Becker resided in North Ballmer, New York. Petitioners Allan J. Becker and Brenda Becker were divorced on December 24, 1980. Brenda Becker did not invest in the Plastics Recycling Program, and no notice of deficiency has been issued to her for taxable years 1981 and 1982. The parties stipulated that Brenda Becker

is not liable for any tax, interest, or additions to tax resulting from any deductions, losses, investment credits, business energy investment credits, or any other tax benefits claimed by Allan J. Becker on his 1981 and 1982 tax returns as a result of his participation in the Plastics Recycling Program. Allan J. Becker did not tell Brenda Becker that he was investing in the Partnership transactions, nor did he inform her that he was filing an application for refund for taxable year 1979. Hereinafter, references to "petitioner" shall be to Allan J. Becker.

After graduating high school, petitioner worked for 3 years as a draftsman with a division of Sherry Rand, and also attended college classes at night. In 1960 petitioner joined his father's food brokerage company, Sidney Becker Associates, Inc. (SBA). Petitioner handled sales in the New York metropolitan area. By 1981 petitioner had acquired 49 percent of SBA and was an officer of the company. SBA's gross sales during the years 1981 and 1982 ranged from $400,000 to $500,000.

Petitioner acquired a 0.671946-percent interest in SAB Recovery for $7,500 in 1981. As a result of his interest in SAB Recovery, on his 1981 return petitioner claimed an operating loss in the amount of $5,955 and investment tax and business energy credits in the amount of $12,380. He claimed a loss in the amount of $344 from SAB Recovery on his 1982 return. Petitioner acquired a 0.507692-percent interest in SAB Recycling for $5,000

in 1982.  As a result of his interest in SAB Recycling, on his
1982 return petitioner claimed an operating loss in the amount of
$3,974 and investment tax and business energy credits in the
amount of $8,002.[5]  Petitioner carried back an additional $262 in
business energy credits to 1979.  Except for $20 of the $344 loss
from SAB Recovery that petitioner claimed on his 1982 return,
respondent disallowed these amounts in full.

Petitioner learned of the Plastics Recycling transactions in
the fall of 1981 from Stuart Becker.  Becker had been preparing
the tax returns for SBA and petitioner since the early 1960's.
He also provided tax advice, tax-oriented financial advice, and
representation services before the Internal Revenue Service.
Becker characterized his relationship with petitioner during the
years at issue as social.  Both men were recently divorced at the
time, and they had frequent discussions about personal matters as
well as SBA.

In the fall of 1981 Becker sent a copy of the SAB Recovery
offering memorandum to petitioner and "told him to look at it and
call me with any questions."  Petitioner subsequently telephoned
Becker and asked him to explain the investment.  Becker gave
petitioner a synopsis of the transaction and its tax aspects.  He

---

[5]    On his 1982 return, petitioner claimed a total loss of
$4,318 ($3,974 from SAB Recycling and $344 from SAB Recovery).
Petitioner reported a combined investment tax and business energy
credit from SAB Recycling in the amount of $8,264 (separately,
each of the credits was in the amount of $4,132).  The business
energy credit was subject to a limitation of $3,870.

explained "that there were substantial tax benefits generated from the transaction, but if it didn't fly economically those tax advantages, i.e., the tax recapture, would have to be returned." The two discussed the economics of the transaction, and Becker told petitioner of his speaking to Canno and visiting Hyannis. Becker also confirmed to petitioner that their father was investing in a Plastics Recycling transaction.

Petitioner met with Becker for breakfast approximately 10 days later to discuss personal matters. Their conversation turned to SAB Recovery, and petitioner expressed some reluctance because he had never before invested in a tax shelter. According to petitioner, Becker told him that he would save more in taxes than he invested. Petitioner described his reaction as follows: "I just said I can't believe it. It was beyond my imagination, because I never was involved in anything like that, where you could make an investment and save a lot more than that investment in taxes." Petitioner understood from Becker that Becker and some of his associates had investigated the Plastics Recycling transactions. Petitioner invested in SAB Recovery after his father verified that he, too, was investing in a Plastics Recycling transaction.

In early 1982, Becker sent petitioner a copy of the SAB Recycling offering memorandum. Petitioner invested in SAB Recycling after briefly speaking with Becker, and again confirming with his father that he, too, was investing in another

Plastics Recycling transaction. Becker Co. prepared petitioner's 1981 and 1982 returns and petitioner reviewed them. Petitioner and Becker did not discuss the Partnership transactions in conjunction with the preparation of either return. Petitioner understood that his brother's (Becker) background was tax oriented.

Petitioner has no education or work experience in plastics recycling or plastics materials. He never read the SAB Recovery and SAB Recycling offering memoranda. Petitioner did not see a Sentinel recycler prior to investing in the Partnership transactions or otherwise independently investigate the Sentinel recyclers. He did not know when or in what amounts the Partnerships were projected to realize a profit. Petitioner was unaware that Becker, as president and sole shareholder of the general partner of the SAB Recycling partnerships, received substantial fees from the Partnerships. In the end, petitioner knew that the Partnerships leased plastics recyclers, and that his brother, the accountant, claimed the machines were state-of-the-art. Petitioner made little, if any, effort to learn more about the transaction, although he was an experienced businessman and corporate officer. Petitioner never made a profit in any year from his participation in the Partnership transactions.

OPINION

We have decided a large number of the Plastics Recycling

group of cases.[6] The majority of these cases, like the present case, raised issues regarding additions to tax for negligence and valuation overstatement. We have found the taxpayers liable for such additions to tax in all but one of the opinions to date on these issues, although procedural rulings have involved many more

---

[6] Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.
 The following cases concerned the addition to tax for negligence, inter alia: Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398; Estate of Busch v. Commissioner, T.C. Memo. 1996-342; Spears v. Commissioner, T.C. Memo. 1996-341; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84; Bennett v. Commissioner, T.C. Memo. 1996-14; Atkind v. Commissioner, T.C. Memo. 1995-582; Triemstra v. Commissioner, T.C. Memo. 1995-581; Pace v. Commissioner, T.C. Memo. 1995-580; Dworkin v. Commissioner, T.C. Memo. 1995-533; Wilson v Commissioner, T.C. Memo. 1995-525; Avellini v. Commissioner, T.C. Memo. 1995-489; Paulson v. Commissioner, T.C. Memo. 1995-387; Zidanich v. Commissioner, T.C. Memo. 1995-382; Ramesh v. Commissioner, T.C. Memo. 1995-346; Reister v. Commissioner, T.C. Memo. 1995-305; Fralich v. Commissioner, T.C. Memo. 1995-257; Shapiro v. Commissioner, T.C. Memo. 1995-224; Pierce v. Commissioner, T.C. Memo. 1995-223; Fine v. Commissioner, T.C. Memo. 1995-222; Pearlman v. Commissioner, T.C. Memo. 1995-182; Kott v. Commissioner, T.C. Memo. 1995-181; Eisenberg v. Commissioner, T.C. Memo. 1995-180.
 Greene v. Commissioner, 88 T.C. 376 (1987), concerned the applicability of the safe-harbor leasing provisions of sec. 168(f)(8). Trost v. Commissioner, 95 T.C. 560 (1990), concerned a jurisdictional issue.
 Farrell v. Commissioner, T.C. Memo. 1996-295; Baratelli v. Commissioner, T.C. Memo. 1994-484; Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434; Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645; Madison Recycling Associates v. Commissioner, T.C. Memo. 1992-605, concerned other issues.

favorable results for taxpayers.[7]

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the transaction, which is almost identical to the Partnership transactions in this case, was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon

---

[7] In Zidanich v. Commissioner, T.C. Memo. 1995-382, we held the taxpayers liable for the sec. 6659 addition to tax, but not liable for the negligence additions to tax under sec. 6653(a). As indicated in our opinion, the Zidanich case, and the Steinberg case consolidated with it for opinion, involved exceptional circumstances.

In Estate of Satin v. Commissioner, supra, and Fisher v. Commissioner, supra, after the decision in Provizer v. Commissioner, supra, the taxpayers were allowed to elect to accept a beneficial settlement because of exceptional circumstances. In Farrell v. Commissioner, supra, we rejected taxpayers' claim to a similar belated settlement arrangement since the circumstances were different and taxpayers previously had rejected settlement and elected to litigate the case. See also Jaroff v. Commissioner, supra; Gollin v. Commissioner, supra; Grelsamer v. Commissioner, supra; Zenkel v. Commissioner, supra; Baratelli v. Commissioner, supra.

the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that petitioner Allan J. Becker's investments in the Sentinel EPE recyclers in this case are similar to the investment described in Provizer v. Commissioner, supra. The underlying transactions in this case, and the Sentinel EPE recyclers considered in this case, are the same type of transaction and same type of machines considered in Provizer v. Commissioner, supra.

Based on the entire record in this case, including the extensive stipulations, testimony of respondent's experts, and petitioner Allan J. Becker's testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the first stipulation of facts and the stipulation of settled issues filed shortly before trial. The record plainly supports respondent's determinations regardless of such concession. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

A. Statute of Limitations

In their petition, petitioners alleged that each of the

notices of deficiency herein was issued after expiration of the respective statutory limitations periods.[8]  Petitioners have the burden of proving when the respective returns were filed and when the general 3-year periods of limitations expired.  <u>Miami Purchasing Service Corp. v. Commissioner</u>, 76 T.C. 818, 823 (1981).  Respondent bears the burden of proving that any extensions of the periods of limitations are applicable.  <u>Id.</u>

Section 6501(a) generally requires an assessment of tax to be made within 3 years after a return is filed.  In the case of a deficiency attributable to a credit carryback, such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the unused credit that results in such carryback may be assessed.  Sec. 6501(j).  If, before the expiration of the time to assess the tax under section 6501(a), the parties consent in writing to extend the time for the assessment of the tax, the tax may be assessed at any time before the end of the period agreed upon.  Sec. 6501(c)(4).

Petitioner filed his 1981 Federal income tax return on or about April 15, 1982.  Therefore, in the absence of any extension, the 3-year period of limitations for that year would have expired on April 15, 1985.  Sec. 6501(a).  Prior to

---

[8]     In their posttrial briefs, the parties addressed this issue only with respect to the notice of deficiency for 1979 and petitioner Brenda Becker.

expiration of the 3-year period, in February 1985 petitioner and respondent executed a Form 872-A, Special Consent to Extend the Time to Assess Tax. The agreement extended the period of limitations until the 90th day after (1) either party mailed to the other a Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, or (2) respondent issued a notice of deficiency. Neither petitioner nor respondent executed a Form 872-T prior to issuance of the notice of deficiency for 1981, which was dated October 5, 1989. Accordingly, the notice of deficiency for taxable year 1981 was issued within the statutory limitations period, as extended by agreement, and the assessment for 1981 is not barred by the statute of limitations.

The deficiency in petitioners' 1979 Federal income tax is attributable entirely to an unused credit carryback from 1982. Therefore, the timeliness of the notice of deficiency for 1979 is controlled by the limitations period for assessing the 1982 deficiency. Sec. 6501(j). Petitioner filed his return for 1982--from which the unused credit was carried back--on or about April 15, 1983. Consequently, in the absence of any extension, the 3-year period of limitations for 1982 would have expired on April 15, 1986. Sec. 6501(a). Before such time, however, in February 1986 petitioner and respondent executed a Form 872-A, and indefinitely extended the limitations period under the same terms agreed upon for 1981. Neither petitioner nor respondent executed a Form 872-T prior to issuance of the notices of

deficiency for 1979 and 1982, each of which was dated September 6, 1989. As to petitioner, therefore, the notices of deficiency for taxable years 1979 and 1982 were timely issued, as extended by statute and agreement, and the assessments for 1979 and 1982 are not barred by the statute of limitations.

With respect to petitioner Brenda Becker, however, the notice of deficiency for 1979 was not timely issued. The Form 872-A executed by respondent and petitioner for 1982 was not signed by Brenda Becker, nor does her name appear in the document. Brenda Becker did not personally execute a Form 872, Consent to Extend the Time to Assess Tax, for 1979 or 1982. Respondent has not shown that when petitioner signed the Form 872-A for 1982, he was acting as an authorized agent for, or otherwise on behalf of, Brenda Becker. To the contrary, petitioner's testimony indicates that Brenda Becker had no knowledge about his investments in the Partnership transactions, his application for and receipt of a refund for taxable year 1979, or his extension of the period of limitations for 1982. We hold that the Form 872-A executed by petitioner and respondent did not extend the period of limitations with respect to Brenda Becker. Consequently, the notice of deficiency for 1979 is time barred as to Brenda Becker.[9] <u>Tallal v. Commissioner</u>, 77 T.C.

---

[9] Although the matter is not addressed by the parties, we note that their Second Stipulation of Facts arguably renders the statute of limitations issue with respect to petitioner Brenda

(continued...)

1291 (1981).

## B.  Section 6653(a)--Negligence

In a notice of deficiency, respondent determined that petitioner Allan J. Becker was liable for the additions to tax for negligence under section 6653(a)(1) and (2) for 1982.[10] Petitioner has the burden of proving that respondent's determination of these additions to tax are erroneous.  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).  In her answer, respondent asserted that both petitioners were liable for the addition to tax for negligence under section 6653(a) for 1979; that petitioner Allan J. Becker was liable for additions to tax for negligence under section 6653(a)(1) and (2) for 1981; and increased the amount of the deficiency subject to section 6653(a)(2) for 1982.  Because these additions to tax were raised for the first time, or increased, in her answer, the burden of proof to that extent is shifted to respondent.  Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994); Bagby v.

---

[9](...continued)
Becker moot.  The parties stipulated that she is not liable for any tax, interest, or additions to tax resulting from any losses or investment tax and business energy credits claimed by petitioner on his 1981 and 1982 tax returns as a result of his participation in the Plastics Recycling Program.  The 1979 deficiency and addition to tax resulted exclusively from the carryback of an unused business energy credit claimed by petitioner in 1982, as a result of his participation in SAB Recovery.

[10]     In the notice of deficiency issued for taxable year 1982, respondent referred to sec. 6653(a)(2) as sec. 6653(a)(1)(B).

Commissioner, 102 T.C. 596, 612 (1994).

Section 6653(a) for 1979 and section 6653(a)(1) for 1981 and 1982 impose an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. McPike v. Commissioner, T.C. Memo. 1996-46. Compare Spears v. Commissioner, T.C. Memo. 1996-341, with Zidanich v. Commissioner, T.C. Memo. 1995-382.

In the present case, petitioner contends that he reasonably relied upon the advice of a qualified adviser, Stuart Becker. A taxpayer may avoid liability for the additions to tax under the

provisions of section 6653 if he or she reasonably relied on competent professional advice. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Freytag v. Commissioner, supra. For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that such professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter. David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); Prohaska v. Commissioner, T.C. Memo. 1991-306, affd. without published opinion sub nom. Virovec v. Commissioner, 983 F.2d 1071 (6th Cir. 1992); Prohaska v. Commissioner, T.C. Memo. 1991-305, affd. without published opinion sub nom. Virovec v. Commissioner, 983 F.2d 1071 (6th Cir. 1992); see also Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to

negligence. <u>Goldman v. Commissioner</u>, <u>supra</u>; <u>Pasternak v. Commissioner</u>, 990 F.2d 893 (6th Cir. 1993), affg. <u>Donahue v. Commissioner</u>, T.C. Memo. 1991-181; <u>LaVerne v. Commissioner</u>, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. <u>Cowles v. Commissioner</u>, 949 F.2d 401 (10th Cir. 1991); <u>Marine v. Commissioner</u>, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); <u>McCrary v. Commissioner</u>, 92 T.C. 827, 850 (1989); <u>Rybak v. Commissioner</u>, 91 T.C. 524, 565 (1988). Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. <u>David v. Commissioner</u>, <u>supra</u>, <u>Goldman v. Commissioner</u>, <u>supra</u>; <u>Freytag v. Commissioner</u>, <u>supra</u>; <u>Beck v. Commissioner</u>, 85 T.C. 557 (1985); <u>Lax v. Commissioner</u>, T.C. Memo. 1994-329, affd. without published opinion 72 F.3d 123 (3d Cir. 1995); <u>Sacks v. Commissioner</u>, <u>supra</u>; <u>Steerman v. Commissioner</u>, T.C. Memo. 1993-447; <u>Rogers v. Commissioner</u>, T.C. Memo. 1990-619; see also the Plastics Recycling cases cited <u>supra</u> note 6.

Petitioner's purported adviser, Becker, had no education, special qualifications, or professional skills in plastics engineering, plastics recycling, or plastics materials. In evaluating the Plastics Recycling transactions and organizing the SAB Recycling Partnerships, Becker supposedly relied upon:

(1) The offering materials; (2) a tour of the PI facility in Hyannis; (3) discussions with insiders to the transactions; (4) Canno; and (5) his investigation of the reputation and background of PI and persons involved in the transactions.

Despite his lack of knowledge regarding the product, the target market, and the technical aspects at the heart of the Plastics Recycling transactions, Becker did not hire an expert in plastics materials or plastics recycling, or recommend that his clients do so. The only independent person having any connection with the plastics industry with whom Becker spoke was Canno. Canno was a client of Becker Co., and was a part owner and the production manager of Equitable Bag Co., a manufacturer of paper and plastic bags. Becker spoke to Canno about the recyclers and PI, but did not hire or pay him for any advice. Canno did not visit the PI plant in Hyannis, see or test a Sentinel EPE recycler, or see or test any of the output from a Sentinel EPE recycler or the recycled resin pellets after they were further processed by PI. According to Becker, Canno endorsed the Partnership transactions after reviewing the offering materials. Asked at trial if Canno had done any type of comparables analysis, Becker replied, "I don't know what Mr. Canno did."

Becker visited the PI plant in Hyannis, toured the facility, viewed a Sentinel EPE recycler in operation, and saw products that were produced from recycled plastic. Becker claims that he was told by PI personnel that the recycler was unique and that it

was the only machine of its type. In fact, the Sentinel EPE recycler was not unique; instead, several machines capable of densifying low density materials were already on the market. Other plastics recycling machines available during 1981 and 1982 ranged in price from $20,000 to $200,000, including the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177.

Becker was also told that PI had put an enormous amount of research and development--10 to 12 years' worth--into the creation and production of the Sentinel EPE recycler. When he asked to see the cost records for some kind of independent verification, however, his request was denied. Becker was informed that such information was proprietary and secret, and that he would just have to take PI's representations as true. Although PI claimed that all of its information was a trade secret, and that it never obtained patents on any of its machines, PI had in fact obtained numerous patents prior to the recycling transactions, and had also applied for a trademark for the Sentinel recyclers. Becker decided to accept PI's representations after speaking with Miller (the corporate counsel to PI), Canno (who had never been to PI's plant or seen a Sentinel EPE recycler), and a surrogate judge from Rhode Island who did business in the Boston/Cape Cod area (and who had no expertise in engineering or plastics materials). Becker

testified that he was allowed to see PI's internal accounting controls regarding the allocation of royalty payments and PI's recordkeeping system in general.  In Provizer v. Commissioner, supra, this Court found that "PI had no cost accounting system or records."

Becker confirmed at trial that he relied on the offering materials and discussions with PI personnel to establish the value and purported uniqueness of the recyclers.  Becker testified that he relied upon the reports of Ulanoff and Burstein contained in the offering materials, despite the fact: (1) Ulanoff's report did not contain any hard data to support his opinion; (2) Ulanoff was not an economics or plastics expert; (3) Becker did not know whether Burstein was an engineer; and (4) Burstein was a client of Miller's and was not an independent expert.  In addition, Ulanoff and Burstein each owned an interest in more than one partnership that owned Sentinel recyclers as part of the Plastics Recycling Program.

Becker explained at trial that in the course of his practice when evaluating prospective investments for clients, he focuses on the economics of the transaction and investigates whether there is a need or market for the product or service.  With respect to the Partnership transactions, the record indicates that Becker overlooked several red flags regarding the economic viability and market for the Sentinel EPE recyclers.  Becker never saw any marketing plans for selling the pellets or leasing

the recyclers. He accepted representations by PI personnel that they would be marketing the recyclers to clients and that there was a sufficient base of end-users for the machines, yet he never saw PI's client list. At the times the Partnerships closed, Becker did not know who the end-users were or whether there were any end-users actually committed to the transaction.

Becker purportedly checked the price of the pellets by reading trade journals of the plastics industry. However, he did not use those same journals to investigate the recyclers' purported value or to see whether there were any advertisements for comparable machines. Information published prior to the Plastics Recycling transactions indicated that several machines capable of densifying low density materials were already on the market, and that the price of polyethylene was declining during the fourth quarter of 1981. In concluding that the Partnerships would be economically profitable, Becker made two assumptions that he concedes were unsupported by any hard data: (1) That there was a market for the pellets; and (2) that market demand for them would increase.

Becker had a financial interest in SAB Recovery, SAB Recycling, and the SAB Recycling Partnerships generally. He received fees in excess of $500,000 with respect to the SAB Recycling Partnerships, which included SAB Recovery and SAB Recycling. Becker also received fees for investment advice from some individual investors. In addition, Becker Co. received fees

from the SAB Recycling Partnerships for preparing their partnership returns.  As Becker himself testified, potential investors could not have read the offering materials and been ignorant of the financial benefits accruing to him.

Becker testified that he and petitioner discussed the propriety of the tax benefits, Becker's visit to PI, and Canno's comments.  Becker did not guarantee the tax benefits to petitioner.  As he recalled, "I explained to * * * [petitioner], as I had explained to virtually all the people I had spoken to, that the only benefit he could count on * * * was a write-off of the investment in the event the deal failed."  Becker thought it was an appropriate investment for petitioner because, "It had minimal risk on an after-tax basis, after-tax meaning a write-off of the investment, not any of the other tax attributes that were attributed to it".  Becker testified that he was very careful not to mislead any of his clients regarding the particulars of his investigation.  As he put it:  "I don't recall saying to a client I did due diligence * * *.   [Rather,] I told * * * [my clients] precisely what I had done to investigate or analyze the transaction.  I didn't just say I did due diligence, and leave it open for them to define what I might or might not have done."

The record in this case shows that petitioner made no effort to learn about the Sentinel EPE recyclers, the Partnerships, or the Plastics Recycling transactions in general.  He ignored Becker's instruction to read the offering memoranda, was unaware

of when and how the Partnerships were supposed to turn a profit, and failed to read the available explanation that Becker received substantial fees from the Partnerships.  In addition, petitioner's recollection of events, and of what Becker told him, is suspect.  Becker testified that he sent petitioner a copy of the SAB Recovery offering memorandum and "told him to look at it", and that he also sent him a copy of the SAB Recycling offering memorandum.  Petitioner claims that he did not review the SAB Recovery offering memorandum, and by extension the SAB Recycling offering memorandum, because he "didn't know there was an offering memorandum available."  Petitioner claims that during their breakfast conversation, Becker indicated that "he felt that, shortly down the road, * * * [SAB Recovery] would start to show a profit, and I could reap the benefits of that."  Becker, however, testified that he did not expect SAB Recovery to receive any cash receipts in 1982.  He explained that he "didn't legitimately and appropriately expect that we would close one day and the checks would come in."  Becker "legitimately anticipated that there would be little or no revenue in the first year of operation of this equipment."

Asked if he invested in the Partnerships without knowing anything about them, petitioner replied as follows:

> I not--I didn't--I knew something about it.  It wasn't just giving * * * [Becker] a check.  I did know that they recycled plastics and they turned used plastic into usable plastic.  And they did have state-of-the-art machinery, which is important to me.

Petitioner defined "state-of-the-art" as "highly-electronic, rather than a lot of mechanical parts--electrical parts, where you can just punch buttons in to the work, rather than people physically moving levers and changing things."  However, the Sentinel recyclers were not "state-of-the-art" by any definition. The Sentinel EPE recycler was incapable of recycling expanded polyethylene by itself, and had to be used in connection with extruders and pelletizers.  In contrast, the Nelmor Regenolux, which was available in 1981 for $38,000, was fully capable of recycling expanded polyethylene or expanded polystyrene and worked better than either the Sentinel EPE or EPS recycler.

Petitioner testified that he invested in SAB Recovery based on a conversation with his father, and Becker's "* * * pushing me into it".  As for SAB Recycling, petitioner testified that he decided to invest in that partnership after Becker purportedly told him that SAB Recovery had done well, and again speaking with his father.  However, petitioner failed to explain how SAB Recovery had done well, except for generating claims to tax benefits.  SAB Recovery received no cash receipts during 1982, and to the extent that the Sentinel EPE recyclers had been placed with end-users, they were placed with end-users that did not have enough scrap ever to pay off the notes on the machines.

Becker certainly recognized that the purported value of the Sentinel EPE recycler generated the deductions and credits in this case.  Becker explained the tax benefits to petitioner, and

warned him that the tax benefits were contingent upon the economics of the transaction. Yet neither petitioner nor Becker verified the purported value of the Sentinel EPE recycler. Petitioner relied on Becker. Petitioner was well aware of Becker's educational and professional background. Becker's expertise was in taxation, not plastics materials or plastics recycling, and his investigation and analysis of the Plastics Recycling transactions reflected this circumstance. Petitioner also spoke to his father, but there is no suggestion in the record that petitioner's father knew anything about plastics materials or plastics recycling, or that he advised petitioner beyond confirming that he, too, was investing in Plastics Recycling transactions. In the end, Becker and petitioner relied on PI personnel for the value of the Sentinel EPE recyclers and the economic viability of the Partnership transactions. See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion."

We hold that petitioner did not reasonably or in good faith rely on Becker as an expert or a qualified professional working in the area of his expertise to establish the fair market value of the Sentinel EPE recycler and economic viability of the Partnership transactions. Becker did not have any education, special qualifications, or professional skills in plastics materials or plastics recycling. A taxpayer may rely upon his

adviser's expertise (in this case accounting and tax advice), but it is not reasonable or prudent to rely upon a tax adviser regarding matters outside of his field of expertise or with respect to facts that he does not verify. See David v. Commissioner, 43 F.3d at 789-790; Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329; Sacks v. Commissioner, T.C. Memo. 1994-217; Prohaska v. Commissioner, T.C. Memo. 1991-306; Prohaska v. Commissioner, T.C. Memo. 1991-305; Rogers v. Commissioner, T.C. Memo. 1990-619; see also Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398; Estate of Busch v. Commissioner, T.C. Memo. 1996-342; Spears v. Commissioner, T.C. Memo. 1996-341, with respect to Becker's advice in Plastics Recycling cases.

Petitioner's reliance on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Reile v. Commissioner, T.C. Memo. 1992-488; Davis v. Commissioner, T.C. Memo. 1989-607, is misplaced. In each of those cases, the Court declined to sustain the negligence additions to tax in part because the taxpayers relied upon a professional adviser. The facts of the instant case, however, are distinctly different from the facts of those cases.

The taxpayers in the Reile case, a married couple, had only 1 year of college between them and characterized themselves as financial "dummies."  In the Davis case, the taxpayers relied upon an adviser who was independent of the investment venture and also relied upon their own review of the offering memorandum that did not reflect that the principals in the venture lacked experience in the pertinent line of business.  This Court concluded that it was reasonable for the taxpayers to rely on such information without taking extreme and expensive steps to verify it.  In the Heasley case, the taxpayers were unsophisticated, moderate-income investors who did not independently investigate the venture at issue, or read the accompanying prospectus in full.  The Court of Appeals for the Fifth Circuit declined to sustain the negligence additions to tax because:  (1) An independent investigation could have been financially prohibitive; (2) the taxpayers read pertinent portions of the prospectus and their advisers explained the rest; and (3) the taxpayers monitored the investment.

In the instant case, petitioner knew or should have known that Becker was not independent of the Partnerships.  The record shows that petitioner's ignorance of the Partnership transactions was due not to a lack of experience, skills, or education.  It would not have been financially prohibitive for petitioner to visit PI or to research the published information indicating that the Sentinel EPE recycler was not a state-of-the-art plastics

recycler.  Indeed, PI's Hyannis plant was not far from SBA's biggest supplier, and Becker could have told petitioner where to find plastics industry trade journals.  Moreover, petitioner did not even read the offering materials provided to him by Becker-- despite express advice that he should do so.  Petitioner's disregard of the offering materials undermines any contention that he monitored his investments.  Accordingly, petitioner's reliance on the Heasley, Reile, and Davis cases is misplaced. See Prohaska v. Commissioner, T.C. Memo. 1991-306; Prohaska v. Commissioner, T.C. Memo. 1991-305.

The facts of petitioner's case also distinguish it from Steinberg v. Commissioner, a Plastics Recycling case consolidated for opinion with Zidanich v. Commissioner, T.C. Memo. 1995-382, wherein this Court declined to impose the negligence additions to tax.  In the Steinberg case, the taxpayers were husband and wife. Neither had any financial or investment background.  The taxpayer wife, who was not employed outside the home, had relied upon her father in all financial matters.  He had advised her that after his death she should rely upon her brother, a highly successful investor.  Accordingly, on her father's death, Mrs. Steinberg turned over management of her inherited funds to her brother, Morton Efron (Efron).  Efron invested Mrs. Steinberg's inheritance in a limited partnership, AMBI, which was formed as an investment vehicle for Efron himself, his sister (Mrs. Steinberg), and their spouses.  AMBI invested in a number of

ventures, including another limited partnership, Efron Investors (EI), which in turn invested in Clearwater, the partnership considered in <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177. Efron did not inform Mrs. Steinberg of the investments in EI and Clearwater, but simply told his sister that her AMBI investments were "doing fine".  She did not learn of AMBI's investments in EI and Clearwater until a few months before trial in the deficiency proceedings arising out of those investments.  In contrast, petitioner invested in the Partnerships of his own volition. Petitioner was not kept in the dark by Becker; instead, Becker provided petitioner with the offering materials, explained the transaction and its risks to petitioner, and related the extent of his investigation to petitioner.  In the <u>Steinberg</u> case, the taxpayers turned over management of Mrs. Steinberg's inherited assets to her brother, and he made the investment decisions in question.  In the present case, Becker brought an investment to his brother's attention, but petitioner made his own investment decisions.  The facts and circumstances of petitioner's case are distinctly different from the <u>Steinberg</u> case and we accordingly consider it inapplicable.

Under the circumstances of this case, petitioner failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on his Federal income tax returns.  It was not reasonable for him to claim such disproportionately large tax benefits on his Federal income tax

returns without making any attempt to learn about the Partnership transactions. Petitioner acknowledged that he found the tax benefits unbelievable. Yet even after Becker expressly warned that such tax benefits were contingent on the economics of the transactions, petitioner made no effort to learn about the Partnership transactions. He ignored Becker's urging that he should read the offering memoranda. His claim that he did not know offering materials were available is not credible and casts doubt on the veracity of the rest of his testimony. We hold that petitioner did not reasonably rely upon Becker, or in good faith investigate the underlying viability, financial structure, and economics of the Partnership transactions. Upon consideration of the entire record, we hold that petitioner Allan J. Becker is liable for the negligence additions to tax under section 6653 for the taxable years at issue. Respondent is sustained on this issue.

## C. Section 6659--Valuation Overstatement

In two notices of deficiency, respondent determined that petitioner is liable for the section 6659 addition to tax on the portion of his 1981 and 1982 underpayments attributable to valuation overstatement. Petitioner has the burden of proving that respondent's determinations of the section 6659 additions to tax are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. at 860-861. In her answer, respondent asserted an increased amount due under section 6659 for 1982. Respondent has the

burden of proof with respect to the increased addition to tax. Rule 142(a); Bagby v. Commissioner, 102 T.C. at 612.

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement. Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b).

Petitioner claimed tax benefits, including an investment tax credit and a business energy credit, based on purported values of $1,162,666 for each Sentinel EPE recycler. Petitioner concedes that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000. Therefore, if disallowance of petitioner's claimed tax benefits is attributable to such valuation overstatements, petitioner is liable for the section 6659 additions to tax at the rate of 30 percent of the portions of his underpayments attributable to such valuation overstatements.

Petitioner contends that section 6659 does not apply in this case because the deductions and credits he claimed were purportedly disallowed on grounds other than a valuation overstatement. Petitioner relies on Gainer v. Commissioner, 893

F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416; Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), in support of this argument.

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements. See McCrary v. Commissioner, 92 T.C. 827 (1989); Todd v. Commissioner, supra. To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements. Krause v. Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v. Commissioner, supra), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

Petitioner has not shown that disallowance of his claimed tax benefits was due to anything other than a valuation overstatement. In each of the notices of deficiency for 1981 and

1982, failure to establish the fair market value of the recycling equipment is cited as a reason for disallowing petitioner's claimed tax benefits. Also, the respective explanations for the section 6659 additions to tax make clear that the deficiencies were attributable to valuation overstatements. The notice of deficiency for 1981 states that "The entire underpayment of your income tax for * * * 1981 is attributable to a valuation overstatement in excess of 250 percent under section 6659". Similarly, the notice of deficiency for 1982 states that "Since the underpayment of tax is attributable to a valuation overstatement, you are liable for a penalty under section 6659". In Provizer v. Commissioner, T.C. Memo. 1992-177, overvaluation of the Sentinel EPE recyclers was the dominant factor that led us to hold that the Clearwater transaction lacked economic substance. Consistent therewith, in holding here that the Partnership transactions lacked economic substance, we rely heavily upon the overvaluation of the recyclers. Overvaluation of the recyclers was an integral factor in regard to: (1) The disallowed tax credits and other benefits in this case; (2) the underpayments of tax; and (3) our holding that the Partnership transactions lacked economic substance.

Petitioner's reliance on Gainer v. Commissioner, supra, and Todd v. Commissioner, supra, is misplaced. See also McCrary v. Commissioner, supra. In those cases, in contrast to the present case, it was found that a valuation overstatement did not

contribute to an underpayment of taxes.  In the Todd and Gainer cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service.  In the McCrary case, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease.  Although property was overvalued in each of those cases, the overvaluations were not the ground on which the taxpayers' liability was sustained.  In contrast, "a different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item."  McCrary v. Commissioner, supra at 859.  Petitioner's case presents just such a "different situation":  overvaluation of the recyclers was integral to and inseparable from petitioner's claimed tax benefits and our holding that the Partnership transactions lacked economic substance.[11]

Moreover, an argument similar to petitioner's was recently rejected in Gilman v. Commissioner, supra, by the Court of

---

[11]   To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an application of Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), we consider it distinguishable.  To the extent that the reversal in the Heasley case is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court and the Court of Appeals for the Second Circuit have disagreed.  See Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) ("The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement"), affg. T.C. Memo. 1989-684.

Appeals for the Second Circuit.  In the <u>Gilman</u> case, the taxpayers engaged in a computer equipment sale and leaseback transaction that this Court held was a sham transaction lacking economic substance.  The taxpayers therein, citing <u>Heasley v. Commissioner</u>, 902 F.2d at 380, and <u>Todd v. Commissioner</u>, 89 T.C. at 912, argued that their underpayment of taxes derived from nonrecognition of the transaction for lack of economic substance, independent of any overvaluation.  The Court of Appeals for the Second Circuit sustained imposition of the section 6659 addition to tax because overvaluation of the computer equipment contributed directly to this Court's conclusion that the transaction lacked economic substance and was a sham.  <u>Gilman v. Commissioner</u>, <u>supra</u> at 151.  In addition, the Court of Appeals for the Second Circuit agreed with this Court and with the Court of Appeals for the Eighth Circuit that "'when an underpayment stems from disallowed * * * investment credits due to lack of economic substance, the deficiency is * * * subject to the penalty under section 6659.'"  <u>Id.</u> at 151 (quoting <u>Massengill v. Commissioner</u>, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427); see also <u>Rybak v. Commissioner</u>, 91 T.C. at 566-567; <u>Zirker v. Commissioner</u>, 87 T.C. 970, 978-979 (1986); <u>Donahue v. Commissioner</u>, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. <u>Pasternak v. Commissioner</u>, 990 F.2d 893 (6th Cir. 1993).

We hold that petitioner is liable for the respective section

6659 additions to tax at the rate of 30 percent of the portions of his 1981 and 1982 underpayments attributable to valuation overstatements.  Respondent is sustained on this issue.


To reflect the foregoing,

Decision will be entered

under Rule 155.